(January 20, 1913.)

## STEWART MINING CO., a Corporation, Appellant, v. ONTARIO MINING CO., a Corporation, and STANLEY A. EASTON and MYRON A. FOLSOM, Respondents.

[129 Pac. 932.]

MINING CLAIMS—EXTRALATERAL RIGHTS—INJUNCTION PENDENTE LITE —DISCRETION OF COURT.

(Syllabus by the court.)

1. Where the Stewart Mining Company owns the Senator Stewart Fraction mining claim, and it is claimed that a vein which apexes in said mining claim extends on its dip outside of the exterior boundaries of said claim and underneath the surface boundaries of the Ontario mining claim, and the Ontario Mining Company is working said Ontario mining claim and extracting large amounts of ore therefrom, which is claimed by the Stewart Mining Company as a part of the Stewart Fraction vein on its dip, and an action is brought to determine the rights of the parties, and application is made for an injunction *pendente lite*, the action of the court in refusing to grant such injunction will not be disturbed

unless it clearly appears that there has been an abuse of the discretion of the court in said matter.

2. In this class of cases an injunction *pendente lite,* upon proper application, should be granted, unless it appears that there is no reasonable ground for the assertion of title in the plaintiff.

3. In this class of cases it is within the discretion of the court to substitute an indemnifying bond in lieu of the injunction.

APPEAL from the District Court of the First Judicial District, in and for Shoshone County. Hon. W. W. Woods, Judge.

Action to determine the ownership of a vein or lode on its dip outside of the surface boundaries of the Stewart Fraction mining claim and to obtain an injunction *pendente lite.* Application for injunction denied. *Affirmed.*

Gunn, Rasch & Hall, Happy, Cullen, Lee & Hindman and Featherstone & Fox, for Appellant.

"Always in questions on the working of mines, the doubt should be resolved in favor of granting the writ." (*Gilpin v. Sierra Nevada etc. Co.,* 2 Ida. 709, 23 Pac. 547, 1014, 17 Morr. Min. Rep. 210.)

An injunction should be granted, pending the determination of the issue as to ownership, unless it appears that the plaintiff's title is bad, or, at least, that there is no reasonable ground for the assertion of title by the plaintiff. (Lindley on Mines, 2d ed., p. 1608.)

The purpose of such injunction is to protect the rights of the parties until the final determination of the case. (*Safford v. Flemming,* 13 Ida. 271, 89 Pac. 827; *Boyd v. Desrozier,* 20 Mont. 444, 52 Pac. 53; Snyder, Mines, sec. 1626 et seq.)

James E. Gyde, John P. Gray and Myron A. Folsom, for Respondents.

"The issuance of a preliminary injunction *pendente lite* rests largely in the discretion of the court, and the exercise of that discretion will not be reversed on appeal unless there appears a clear abuse of such discretion." (*Angell v. Con-*

*tinental Oil Co.,* 19 Ida. 746, 115 Pac. 692; *Sharon v. Sharon,* 75 Cal. 1, 16 Pac. 345.)

The courts do not grant injunctions upon mere chance of extralateral rights. (*Montana Ore Purchasing Co. v. Boston etc. Min. Co.,* 22 Mont. 159, 56 Pac. 120; *Collins v. Bailey,* 22 Colo. App. 149, 125 Pac. 543.)

SULLIVAN, J.—This appeal is from an order denying the application of the appellant for an injunction *pendente lite.* The complaint alleges the ownership by the appellant of the Stewart Fraction quartz lode mining claim and that within said claim is a vein or lode, the top or apex of which crosses the easterly end line of said claim at approximately the center thereof between corners 1 and 2 and extends within the boundaries of said claim in a westerly direction, following the general course of said vein for a distance of 705 feet, more or less; that said vein has a downward course, and descends into the earth southerly and beyond the south boundary and side line of said claim into and beneath the surface of the Ontario lode mining claim; that defendants have been, and are now, extracting ore and mineral from that part of said vein beneath the surface of the Ontario claim between a vertical plane drawn downward through the east end line of said Stewart Fraction claim extended southerly in its own direction and a vertical plane drawn downward through a line parallel to, and 705 feet westerly from, said east end line extended.

The prayer is for an accounting, for judgment for the value of the ore and mineral removed by the defendants, and for a temporary injunction *pendente lite* and a permanent injunction when the action is finally determined.

The complaint is supported by several affidavits. At the time of the commencement of the action a restraining order and an order to show cause why an injunction *pendente lite* should not be granted were issued. The application was made and decided upon the complaint, affidavits filed by the respective parties, oral testimony adduced by the cross-examination of certain of the witnesses for the plaintiff and the oral

testimony of Easton, one of the defendants. The court re-
fused to grant the injunction *pendente lite,* and it is from that
order that this appeal is taken.

The only error specified is that the court erred in denying
said application for an injunction.

There appears to be no question in regard to the fact that
the Stewart Mining Co., a corporation, owns the Senator
Stewart Fraction mining claim, which claim is patented.
There are three ore bodies beneath the Ontario mining claim,
which are in controversy. The most southerly one is desig-
nated as the ''Frank'' ore body, the most northerly the
''Gray'' ore body, and the middle one, the ''May'' ore body.

It is contended by the appellant company that the apex
of said ore bodies is within the surface boundaries of the
Senator Stewart Fraction mining claim, and that the ore in
said ore bodies is the property of the Stewart Mining Com-
pany. It is claimed that said apex is a subsurface apex. It
is admitted by both the appellant and the respondents that
the said vein or lode ends along the line of the said apex
where it encounters a fault of large magnitude known as the
''Osborn'' fault. What is claimed by the appellant to be the
apex of said vein is claimed by the respondents to be the side
edge or bottom edge of the vein. There is but little contro-
versy regarding the facts to be considered in determining
the question of apex. The position of the respondents with
reference to said alleged apex is stated in the affidavit of Mr.
Hershey, one of the expert witnesses for the respondents,
as follows:

''The apex alleged as crossing the easterly end line of the
Senator Stewart Fraction mining claim and extending thence
substantially parallel to the said line of the said claim is the
line along which the northeast ore body is cut off by a great
fault. This fault was observed on October 7th, this year, in
the Fir tunnel, and in the stopes near the three hundred
foot level. . . . . It is one of the great faults of the district
and has a very strong gouge and fault breccia. This dis-
placement on the fault is not definitely known but it is cer-
tainly some thousands of feet. It is younger than and cuts

off all the veins of the system to which the Stewart ore bodies belong. In the Fir tunnel, and near the three hundred foot level, it strikes approximately east and dips approximately south. Projecting it to the surface at any dip known to be persistent for some distance or any section of the fault will bring its apex well north of the northeast or No. 1 corner of the Senator Stewart Fraction claim, hence outside of the claim. As the northeast ore body in the Stewart mine approaches this great fault, it is broken and bent somewhat toward the right by the drag of the fault. It is further broken and dragged in the fault breccia, but is cut off rather abruptly on the Fir tunnel level. In the stopes immediately above the three hundred foot level, there is an angle of more than thirty degrees between the fault and the adjacent portion of the vein. From a geological standpoint, the above defined line along which the vein is cut off by the great fault is not a top or an apex, but rather the bottom edge of the ore body. From the known structural relations of the district, it may be premised that this fault will continue to cut off the vein in depth, so that by going down on the dip of the vein on any line one will come eventually to this fault. For practical purposes it is the downward termination of the vein. In the same way, the Frank ore body is terminated downward by the fault traced upward from the Ontario workings. The only essential difference between the two faults is that the displacement on one apparently is much greater than on the other. The real apex of each of these ore bodies must be looked for upward. From a knowledge of the position of the Frank vein in the so-called Stewart upper tunnel, I believe the real apex of the vein to lie within the west four hundred feet of the Senator Stewart Fraction claim, substantially as indicated in a plat accompanying the affidavit of F. W. Callaway. It has a course approximately parallel to the general course of the vein. . . . . The position of the true or subsurface apex of the northeast [or Gray] ore body or vein, in the Senator Stewart Fraction claim, is not known to me, but from the known position of the vein in the workings, I believe it must lie more than six hundred feet westerly from

the easterly end line of the claim, and know that it does not pass through this easterly end line.''

Witness Bailey testified: ''I visited the place where the vein and ore body within the Stewart works terminates underneath the east end line of the Senator Stewart Fraction claim. Said ore body and vein are cut off underneath said east end line by fault dipping southwest and having a strike, the course of which is substantially parallel to the side lines of the Senator Stewart Fraction claim. The line of the vein where it is cut off by the said fault beneath the east end line of the Senator Stewart Fraction claim is merely the edge of the vein on the line of its dip. The apex of said Stewart vein is much farther to the west end, judging from the dip of the vein, the apex has a course almost at right angles to the course of the alleged apex described in the complaint herein.''

Witness Boehmer testified: ''I find a vein penetrating both properties, having a course north thirty degrees east, nearly parallel to the end line of the Senator Stewart Fraction claim and its apex crossing the southerly side line of the latter about seven hundred feet to the west of its easterly end line.

''At about the middle of this claim the vein is abruptly terminated by an extensive fault which has a course north seventy-five degrees west. The dip of the vein is in a direction south sixty degrees east, nearly parallel to the side lines of the Senator Stewart Fraction claim.

''The apex of the vein would cut both side lines of this claim, if not cut off by the fault. The fault cuts off the vein on its course to the north, and this edge of the vein against the fault is nearly parallel to the dip of the vein and is in no sense the apex of the vein. The apex of this vein does not and cannot cross the easterly end line of the Senator Stewart Fraction claim.''

Witness Bradley testified: ''The vein now being worked in the Senator Stewart Fraction is one of the northerly and southerly veins of the Wardner district, which is cut off on its northeasterly strike by one of the many important faults that traverse the Wardner district, i. e., the northeasterly

limit of the stopes on the vein now being worked in the Senator Stewart Fraction is the edge of the vein on its dip as cut off by the above mentioned easterly and westerly fault, the angle between the strike of this fault and the strike of the Senator Stewart Fraction vein being at least thirty degrees. The apex of this easterly and westerly fault at the surface would be to the north of the Senator Stewart Fraction claim, because its dip is to the southwest. The apex of the ore itself would have a northeasterly strike across the western portion of the Senator Stewart Fraction claim, crossing beneath the side lines of the Senator Stewart Fraction claim, were it not cut off to the north by another fault before it reaches the northerly side line of the Senator Stewart Fraction claim. . . . . From my knowledge of the underground workings of the different veins being worked in the Senator Stewart Fraction and Ontario mines, it is absolutely a physical impossibility for the Ontario ore bodies to have their apex in position as alleged by the Stewart Mining Company in the complaint herein, nor does the apex of any present known vein cross the easterly end line of the Senator Stewart Fraction claim.''

Witness Sinks testified: ''The alleged apex described in the complaint herein as crossing the east end line of the Senator Stewart Fraction, occupies a position at right angles to the course of the ore bodies which I have been working for the Ontario Mining Company.''

There are affidavits or other witnesses for the respondents substantially to the same effect as given above.

Witness Green, for the appellant, in his affidavit, among other things, states as follows: ''This vein has a course which resembles an arc of a circle in which the strike is continually changing, with a consequent change in the direction of the dip. As it approaches the northeast its course changes until it lies approximately east and west, making only a very small angle with the strike of the fault mentioned elsewhere. That this fault does not constitute a side edge termination of this vein is conclusively shown by the fact that the vein departs from the fault at an angle less than forty-five degrees on its

strike, and has a course downwards from the point of termination of forty-five to fifty degrees below the horizontal in a direction parallel to the east end line of the Senator Stewart Fraction claim. Nor can this termination possibly constitute a bottom edge of this vein, for the even greater reason that the included angle between the course of the vein and the course of the fault is very considerably less than ninety degrees. This fault has a known displacement of several thousand feet, which renders it impossible to correlate the vein with any vein on the north side of this fault.

"The facts as exposed in the ground show conclusively that the true top or apex of this vein crosses the east end line of the Senator Stewart Fraction claim and continues in a general westerly and southwesterly direction to and across the south side line of this same claim at a point approximately seven hundred and five feet west of the southeast corner No. 2 of the Senator Stewart Fraction claim."

Witness Clancy, in his affidavit, states as follows: "I have prepared a map which correctly represents and shows the true course of apex of said vein in the Senator Stewart Fraction mining claim, which map is made a part of this affidavit. The apex of said vein as depicted on said map is not the side edge or bottom edge of the vein but is the true top or apex. From the said top or apex the vein has a downward course for a distance of over sixty feet at an angle of from forty-five to fifty degrees from the horizontal and continues in a downward course at a lesser angle to and into the Ontario mining claim. . . . .

"I have maps of cross-sections of the vein from the top or apex of the Stewart Fraction to the workings in the Ontario claim, which said maps are hereto attached and made a part of this affidavit. The apex of said vein, as shown by the map hereinbefore referred to, and the downward course of the vein as shown by such cross-sections were placed on such maps by me from actual surveys made by me in the ground, in connection with mining operations conducted therein."

Witness Wilson testified: "I have read the affidavit of Fred T. Greene with reference to the apex or top of the vein in the Senator Stewart Fraction claim being the side edge of the vein. I agree with Mr. Greene that the conditions as they exist conclusively show that the fault is not along the side edge of the vein but is along the apex. This vein, extending easterly and westerly, has a downward course southerly at an angle of forty-five or fifty degrees from the horizontal for a distance of fifty feet or more, after which the angle of the downward course decreases. It can be followed along its course easterly and westerly for a distance of several hundred feet. The downward course of this vein from the top or apex is such as to preclude any possibility of what I state to be the apex being the side edge of the vein."

Witness Beaudry testified: "The apex of this vein, as it was found to exist by actual mining operations conducted, is correctly depicted on the map made and a part of the affidavit of Mr. Clancy; that the stopes and workings following the vein for a considerable distance along this vein in the Stewart Fraction claim are closed by filling and pressure of the ground so that it is impossible at this time and has been impossible for some time to enter the same. I know, however, that the vein was continuous and the ore in the vein was continuous, as stated above. This vein as disclosed by such workings had a pitch downward from the apex at an angle of forty-five to fifty degrees from the horizontal for a distance of sixty feet. This downward course of the vein can now be seen in the stopes, which are open. The ore body and vein in the Stewart Fraction claim, which extends easterly and westerly along the claim, is of my own knowledge, gained from actual mining operations in the property, a part of and connected with the ore body in the Stewart mining claim designated by Mr. Hershey as the Frank ore body, and which is in fact the Stewart ore body. The apex of the vein in the extending through the east end line of the Stewart Fraction claim is not the side edge of a vein or the bottom edge of a vein, but is the top and true apex of the vein. From this apex

the vein has a downward course to and into the workings of the Ontario claim.

"I am familiar with the fault disclosed in the three hundred and the two hundred levels of the Stewart mine, and referred to by Mr. Hershey as the second fault in the Ontario. This fault has caused a displacement of the vein in the two hundred level of about thirty feet. Stoping is now being done above this level and at the top of the stopes the ore from both sections of the vein is continuous through the plane of the fault. I therefore know and state, that what is designated in the affidavit of Mr. Calloway as the southern ore body in the Ontario is a part of the same vein as the other ore bodies shown on the map and made a part of his affidavit. There is a working known as the three hundred of the Stewart extending from the east and west apex in the Stewart Fraction claim to a point in the Ontario claim near the northwest boundary thereof. From this working a drift has been run southerly on ore in the vein to a point within a very short distance of the stopes extended by the Ontario Mining Company above the Gray drift, the works so extending from the east and west apex in the Stewart Fraction has followed the vein and has been in ore all the way. There is no doubt but that the ore body of the Ontario, designated as the Gray ore body, is a part of the same vein and ore body disclosed in the working and drift mentioned."

Witness Frank testified: "That what he [Clancy] designates as the top or apex of the vein is not the side edge or the bottom edge of the vein and cannot be, for the reasons stated in the affidavit of Mr. Fred T. Greene, to which reference is hereby made. That this apex at all points constitutes the topmost portion of the ore body and vein which has been mined below, and from this apex the vein has a downward course at an angle from the horizontal in excess of forty-five degrees, which is wholly inconsistent with the claim of the defendant that this apex is the side edge or bottom edge of the vein."

Witness Miller testified: "That the portion of the apex of the Stewart vein westerly from the point where it crosses the

east end line of the Stewart Fraction mining claim, to the point where it begins to curve to the southwest is not the end of the vein, cut off by the major fault running easterly and westerly through the country, the footwall of which is northerly of the Stewart vein, is evidenced by the fact that the portion of the vein in the easterly workings of the Stewart Mining Company has a course or trend more nearly with the course or trend of the fault than at right angles to, and the vein dips away from the fault to the south at an angle of less than forty-five degrees. In other words, the angle of approach is much under forty-five degrees, whereas the angle would have to exceed forty-five degrees before the question could be mathematically raised as to whether it could possibly be the end of the vein or no.''

Witness Merriam testified: '' . . . . that the top or apex is along a fault plane; that from the said top or apex the vein has a downward course at an angle from the horizontal of forty-five to fifty degrees; that the said apex is not the side edge or bottom edge of the vein but is the true top or apex of the vein; that affiant followed said vein from its top or apex in its downward course to the stopes in the Ontario claim.''

Clancy testified orally that the elevation of the top of the stope at or near the east end line of the Senator Stewart Fraction claim is approximately 2,665 feet, and that the elevation of the top of the stope at a point marked ''N'' on the map introduced as Exhibit ''E'' is approximately 2,990 feet, and that there is a difference in elevation of 325 feet; that the distance between the points mentioned is 600 feet; that the angle of declination is approximately twenty-six degrees, which is less than the slope of the mountains in the Coeur d'Alene district, the usual slope being about thirty degrees. The witness further testified that the cross-sections shown on said map show that the vein has a downward course of 45 degrees from the top or apex for a distance of eighty or ninety feet, and that the cross-section ''B'' shows the vein to have a downward course as it leaves the apex of forty-five degrees.

There is a clear conflict in the opinion testimony of the witnesses as to whether the apex of said three ore bodies is within

the exterior boundaries of the Stewart Fraction mining claim. The main question in the case is whether the end or edge of the vein in the Senator Stewart Fraction, along the Osborn ·fault, as above described in the testimony, is an apex. The witnesses for the defendant state that the end or edge of the vein along said Osborn fault is the side or bottom edge, and the witnesses for the plaintiff testify that said end or edge of the vein is not the side or bottom edge but is the top edge of the vein or apex. The testimony is uncontradicted that from the edge of the vein along said fault the vein has a downward course for a distance of from 80 to 100 feet of from forty-five to sixty-five degrees and then flattens but still has a pronounced downward course to the said ore bodies in the Ontario mine.

As this case will shortly be determined upon its merits, we are not inclined to comment very extensively upon the evidence. While we think from all of the evidence the court would not have abused its discretion in granting an injunction *pendente lite* or in requiring the respondents to give a sufficient bond to secure the appellant for the ore taken out, in case the action was finally determined against the respondents, we are not inclined to hold that the court abused its discretion in refusing to do so. However, in cases of this character, it is proper for the court to grant an injunction or require security to be given pending the determination of the issue as to the ownership of the ore, if there is any doubt in the mind of the court as to the title. The mere existence of a doubt as to the title does not of itself constitute a sufficient ground for refusing an injunction. However, in questions of injunction against the working of mines, the doubt should be resolved in favor of granting the writ. This comports more with substantial justice to the parties, we think, than to leave the plaintiff to pursue his remedy at law provided he is successful in sustaining his title to the ore. (Lindley on Mines and Mining, sec. 872, p. 1608.) ·

It was held by this court in *Safford* v. *Fleming*, 13 Ida. 271, 89 Pac. 827, that it has been the practice of courts in mining cases to be liberal in granting injunctive relief in min-

ing litigation, in order that one party might not be placed in a worse position during the litigation than he otherwise might be. In Snyder on Mines, sec. 1628, it is said: "It is easy to see why this remedy should be granted more readily in a case where the person against whom it is asked is mining and removing the minerals than in almost any other case."

We are unable to say, in this case, that the judge or trial court abused its discretion in refusing to grant said injunction *pendente lite*, therefore its action therein will be affirmed, and it is so ordered. Costs awarded to respondents.

Stewart, J., concurs.